# EXHIBIT "3"

| **From:** | Paul Dierdorff |
|---|---|
| **Sent:** | Friday, August 27, 2021 2:38 PM |
| **To:** | DEPARTED - Ismail Uzdil |
| **Subject:** | FW: Contract |
| **Attachments:** | Universal Properties Agreement V3 7.23.21.docx |

Paul R. Dierdorff
Petroleum Marketing Group Inc.
Wholesale Sales
Phone #: 410-259-2409

From: Paul Dierdorff
Sent: Monday, July 26, 2021 4:44 PM
To: Kazmi . <sk@upssites.com>
Subject: FW: Contract

Changes to the first paragraph  should give you what you need in terms of cancellation of old and implementation of the new economics. We should be able to proceed and if today prevent the allocation shut down.

Paul R. Dierdorff
Petroleum Marketing Group Inc.
Wholesale Sales
Phone #: 410-259-2409

From: Ismail Uzdil
Sent: Monday, July 26, 2021 4:39 PM
To: Paul Dierdorff <pdierdorff@petromg.com>
Subject: RE: Contract

Best Regards,

**Ismail Uzdil**
**Director of Supply & Trading**
**Petroleum Marketing Group Inc.**
e: iuzdil@petromg.com
o: 703-496-1076
c: 870-312-0444
ICE: iuzdil

PMG 001032

From: Paul Dierdorff <pdierdorff@petromg.com>
Sent: Monday, July 26, 2021 2:11 PM
To: Ismail Uzdil <iuzdil@petromg.com>
Subject: FW: Contract


Paul R. Dierdorff
Petroleum Marketing Group Inc.
Wholesale Sales
Phone #: 410-259-2409

From: Kazmi . [mailto:sk@upssites.com]
Sent: Monday, July 26, 2021 2:01 PM
To: Paul Dierdorff <pdierdorff@petromg.com>
Cc: Ismail Uzdil <iuzdil@petromg.com>
Subject: Re: Contract

Paul, can you please, send for our review of your proposed termination agreement of the existing contract. I will forward to my attorney and have her revert back asap.


Thanks

On Mon, Jul 26, 2021, 1:19 PM Paul Dierdorff <pdierdorff@petromg.com> wrote:

> Shamikh,
>
> Just so you are aware of what is going on, I have been informed by Gulf Oil that should an agreement not be reached today that they intend to cut off the fuel allocation until an agreement is reached. I'm sorry about this decision but it is out of my control. As for invoices retroactive to 07/16 they will be invoiced to PMG under the new economics and as a result we will invoice them to you under the new economics as well. Per our conversation I will forward your upcoming email to corporate for them to review.
>
>
> Paul R. Dierdorff
>
> Petroleum Marketing Group Inc.
>
> Wholesale Sales
>
> Phone #: 410-259-2409

2

PMG 001033



# UNBRANDED SALES AGREEMENT

THIS AGREEMENT ("Agreement") is entered into on <u>July 23, 2021</u> between Petroleum Marketing Group, Inc. ("Seller"), whose address is 2900 Telestar Court, Falls Church, VA, 22042, and Universal Property Services, Inc., ("Purchaser"), whose address is 6 Lenn Road, Allentown, NJ, 08501 and supersedes the unbranded sales agreement between parties above dated February 3, 2021.

## PURCHASE AND SALE OF UNBRANDED PRODUCTS

Seller shall sell and deliver to Purchaser, and Purchaser shall purchase and accept from Seller, the weekly/monthly/annual quantities of Products specified on Exhibit A ("Annual Contract Volume").

## TERM AND TERMINATION

The term of this Agreement begins on **August 2, 2021,** or the date of execution by Seller, whichever is later and ends on **February 3, 2022.** Either party may terminate this agreement, with or without cause, by providing written notice thirty (30) days prior to termination.

## PRICE AND TERMS

The payment terms and pricing are as follows:

**PAYMENT METHOD:** Electronic Funds Transfer, draft.

**PAYMENT TERMS:** Net 3 day terms from the date of lifting.

## PRICING FORMULA

Same day posted OPIS Contract Low (6:00 pm assessment) out of Philly, PA or Paulsboro, NJ, whichever is lower plus $0.0040.

Saturday and Sunday liftings will be priced off Friday's OPIS assessment. Daily pricing will run midnight to midnight. Any applicable Local, State, and Federal Taxes or fees will be billed as separate line items. Product will be invoiced on a Gross gallon basis.

## SECURITY DEPOSIT

Seller has agreed to extend credit. Such credit is extended on the following terms and conditions:

a) Purchaser shall maintain a non-interest bearing business risk deposit (the "Business Risk Deposit") in the amount of One Hundred Thousand ($100,000.00) Dollars with the Seller.

b) PMG shall have the right to increase the amount of the security deposit required by this paragraph; if the purchaser has failed to promptly perform the financial obligation under this agreement.

## DELIVERIES

All Products will be sold by the Seller to the Purchaser at Rack origin at the Terminal identified in Exhibit A.

a) Notwithstanding any other provision in the Contract between Purchaser and Seller, all products will be sold F.O.B. the terminal. Seller shall have no responsibility for the delivery of product from the terminal to the

PMG 001034

locations. Instead, Purchaser and its selected carrier(s) shall be solely responsible for hauling the products from the terminal to Purchaser's locations. Purchaser hereby indemnifies and holds Seller harmless from and against all claims, demands and liabilities arising from or related to the performance of the hauling function, and the delivery of such product. Title and risk of loss passes to Purchaser or its selected carrier(s) when the products pass into the transportation vehicle designated by Purchaser to receive such product at the terminal. Purchaser and its selected carrier(s) shall provide or arrange delivery for all products. Purchaser and Purchaser's selected carrier(s) shall comply with all rules and regulations at the terminal designated and authorized by Seller for Purchaser to receive product. Purchaser or the Purchaser's selected carrier as applicable, must provide satisfactory evidence of insurance (which shall include Seller and other parties as Seller may reasonably require as additional insured(s)), including an MCS-90 endorsement, when requested by Seller. Purchaser recognizes and acknowledges that without appropriate insurance, including an MCS-90 endorsement, PMG, Gulf, or any other supplier may deny access to the terminal.

b) Purchaser understands that loading of transportation equipment at the terminal will be on a first come first served basis. Purchaser is solely responsible for all demurrage as related to product for Purchaser's account, except to the extent caused by Seller's fault.

c) Seller may, from time to time, change the origin point(s) by providing the Purchaser with notification.

d) Title and risk of loss passes to Purchaser at lifting.

e) Purchaser shall provide or arrange delivery for all Products.

f) Whether Purchaser uses its own transportation equipment to transport the Products, or engages a carrier to do so, Purchaser or Purchaser's carrier, as the case maybe, shall comply with all rules and regulations at the Terminals, including satisfying any insurance requirements required for access to the Terminals.

g) Appropriate Sold To numbers must be used in picking up Product.  Seller is under no obligation to make any invoice corrections in the event an incorrect Sold To number is used.

## RATABILITY

During the Term of this Agreement, Universal Property Services, Inc. will buy and take delivery of and PMG will sell and deliver each month the quantities as established.  Volume is contracted on a ratable basis and pricing is structured as such.

Universal Property Services, Inc. will receive seven days allocation weekly Thursday to Wednesday of its daily ratable lifting quantity which is 288,461 gallons per week and 41,209 gallons per day.  Universal Property Services, Inc. may lift no more than 120% of its daily allocation on any given day, or 110% of its weekly and monthly allocation per Exhibit A.  Contract volumes may be increased during the course of the contract with mutual agreement by both parties.  If the weekly liftings fall below 90% of the weekly allocations a penalty of 2 cents per gallon would be applied for the volume short fall at the end of each month.

## AVAILABILITY

If the product is not available at any delivery point, PMG will provide alternate supply for Universal Property Services, Inc. within the same general market area at the contract price.  In the event the total area market is out of supply, PMG may offer Universal Property Services, Inc. an alternate terminal in another market to continue product supply at the lowest cost possible based in that alternative terminal(s)' respective market(s)' own supply and pricing environment at the time of the lifting, however, lowest cost is not guaranteed.

## FORCE MAJEURE

If either party is rendered unable, wholly or in part, by force majeure to carry out or is delayed in carrying out its obligations under the agreement other than the obligation to make payments when due, that party must give the other party prompt written notice of the force majeure with reasonably full particulars concerning it,

PMG 001035

whereupon, the obligations of the parties, so far as they are affected by the force majeure, will be suspended during, but no longer than, the continuance of the force majeure.  The affected party must use all possible diligence to remove the force majeure as quickly as possible and must notify the other party promptly in writing when the force majeure event has terminated. In the event PMG is unable to supply under this Force Majeure provision, Universal Property Services, Inc. may attempt to obtain Product from a third party without being in breach of any of its obligations under this Agreement. All Product purchased from the third party pursuant to this Section shall be counted towards Universal Property Services, Inc.'s minimum volume obligation hereunder.

**CREDIT:**

As of the inception of this supply agreement and after returned acceptable credit information, PMG will extend adequate credit to Universal Properties in an amount sufficient to support purchases of the maximum contract volumes under this agreement. The pricing structure contained herein is based on current regulations, rates, and product specifications.  All deliveries made under the terms of this contract will be made in accordance with regulations and specifications in effect at time and place of delivery.  Accordingly, any price increase resulting from PMG's supplier cost and changes to current regulations, rates and/or specifications will be additional to the prices contained in this Contract Agreement with at least 10 days of notification.

If there is or is proposed a material change in the applicable federal renewable fuels standards (Renewal Fuel Standard II or any additional or successor program or law, referred to collectively herein as "RFS"), including but not limited to changes in the point of obligation, that PMG reasonably believes changes the commercial terms of this agreement, then the Parties agree to use commercial best efforts to renegotiate the terms of this Agreement that are impacted by the change or changes in the RFS.  PMG may initiate such negotiations at any time after changes in the then applicable RFS are proposed by a governing or regulatory authority with jurisdiction over RFS standards.  If at any time during the period one hundred and eighty (180) calendar days prior to any published implementation do not or will not result in commercial terms similar to those intended under this Agreement as of the date hereof, then either party may upon five (5) calendar days' notice terminate this Agreement without any further responsibility or any liability to the other party hereunder.

**TAXES**

It is agreed that any duty, tax, fee or other charge which Seller may be required to collect or pay under any municipal, state, federal or other laws now in effect or hereafter enacted with respect to the production, manufacture, inspection, transportation, storage, sale, delivery or use of the product(s) covered by this  Supply Agreement.

**ENVIRONMENTAL COMPLIANCE**

(a) Purchaser shall become informed about and comply with all local, state and federal laws, statutes, regulations and ordinances related to environmental protection or compliance relevant to Purchaser's operations at the Premises, whether currently in effect or which may come into effect in the future.

(b) Purchaser shall comply with all applicable local, state and federal underground storage tank ("UST") compliance requirements, whether currently in effect or which may come into effect in the future, including, but not limited to: (i) required inspections of any release detection equipment for USTs and product lines; (ii) required inspections of any automatic tank gauging equipment; and (iii) maintenance and required inspections of any vapor recovery equipment. Purchaser shall maintain written records of all maintenance and inspections of UST equipment. Purchaser will maintain such records at the Premises as required by law.

 (c) Purchaser shall immediately notify Seller and any appropriate local, state or federal governmental agency after discovery of any inventory loss or other condition which may be the result of a leaking UST or other equipment failure. Purchaser shall immediately investigate and undertake all appropriate initial abatement and other emergency measures to contain, treat, mitigate and/or remediate a discharge, spill, or release of motor fuels or other petroleum products at the Premises.

(d) Purchaser shall properly maintain all USTs, hoses, connections, and associated equipment at the Premises. Seller may, without liability to Purchaser, refuse to make delivery of products covered under this Supply Agreement if Seller believes any UST, hose, connection, or associated equipment is not safely maintained or in compliance with applicable safety standards.

(e) Purchaser shall indemnify, defend, protect and hold Seller, its employees, officers, directors, shareholders, agents and affiliates harmless from and against any and all liabilities, losses, obligations, claims, damages (consequential or otherwise), penalties, suits, actions, judgments, costs and expenses including attorneys' fees) of whatever nature for personal injury (including death) of persons (including, without limitation, agents and employees of Seller or Purchaser) or property damage (including, without limitation, damage to the property of Seller or Purchaser), which may be imposed on, incurred by or asserted against Seller directly or indirectly, (i) caused in whole or in part by Purchaser's failure to comply with the terms of this paragraph or with any local, state or federal law, statute, regulation or ordinance, whether currently in effect or which may come into effect, related to environmental protection or environmental compliance or (ii) for any releases or discharges of petroleum products into the environment caused, in whole or in part, by the acts or omissions of Purchaser, its employees, agents, contractors, customers, licensees, or invitees. This indemnity in no way limits and is intended to be within the scope of the general indemnity set forth in this paragraph hereof. The terms and provisions of this paragraph shall survive the expiration or termination of this Supply Agreement.

## INSURANCE

Purchaser shall procure and maintain with insurance companies having a minimum rating of A.M. Best Company of A- or equivalent, for the duration of this Agreement, the following minimum types and limits of insurance:

(1) Workers Compensation Insurance with statutory limits, and Employer's Liability Insurance with limits of not less than $1,000,000 each occurrence, both coverages to be endorsed as required under any state or federal statute or through any common law process;

(2) Business or Commercial Automobile Liability Insurance covering all vehicles used in the operations of Purchaser with limits of not less than $5,000,000 each accident to be endorsed with MCS-90 when hazardous material transportation is involved; and

(3) Commercial General Liability Insurance (including, without limitation, contractual liability and unbranded product liability) with combined bodily/personal injury and property damage limits of not less than $1,000,000 each occurrence.

Upon Seller's request, Purchaser shall furnish evidence satisfactory to Seller that such insurances are in Effect.

## ATTORNEY'S FEES

Seller or Purchaser, as the case may be, will be entitled to recover from the other party reasonable attorney's fees and other legal costs the prevailing party incurs in order to secure or protect the rights inuring to the prevailing party under this Agreement, or to enforce the terms thereof.

**Notices**. All written notices required or permitted to be given by this Supply Agreement shall be deemed to be duly given if delivered personally or sent by certified or overnight mail to Seller or to Purchaser, as the case may be, at the address set forth above or to such other address as may be furnished by either party to the other in writing in accordance with the provisions of this paragraph. The date of mailing shall be deemed the date of giving such notice, except for notice of change of address, which must be received to be effective. Agreement shall be added to the prices to be paid by Purchaser for product(s) purchased hereunder.

PMG 001037

# EXHIBIT A
# (ANNUAL CONTRACT VOLUME)

**PURCHASER:** UNIVERSAL PROPERTY SERVICES, INC.

**TERMINAL:**    Gulf Woodbury, NJ

**PRODUCT:**    Reformulated Ethanol Blended Gasoline (RFG)

**GRADE**:    All

This Commodity Schedule below is attached to, and made a part of, a certain Motor Fuel Supply Agreement (Unbranded) (the "Supply Agreement") between Purchaser and Seller dated , February 3, 2021. Unless otherwise indicated, the capitalized terms used in this Commodity Schedule shall have the same meaning used in the Supply Agreement.

**QUANTITY**

Except as otherwise provided in the Supply Agreement, the quantity of product covered  by this Commodity Schedule shall be all Purchaser's requirements, but in no case less than a minimum of Fifteen Million (15,000,000) gallons from     February 3, 2021     to  February 3, 2022     .

**Gasoline Volumes:**

288,461 gallons/week

1,153,846 gallons/month

15,000,000 gallons/year

A 2 cents per gallon penalty shall be assessed to the Purchaser for volumes below the 90% weekly allocations for each month.  If the Purchaser lifts less than 90% of the Weekly and Monthly allocations consecutively twice or more, the Seller reserves the right to cancel the agreement within 30 days' notice.

Except as otherwise provided in the Contract, the quantity of product covered by Exhibit A  shall be the Purchaser's requirements, but in no case less than a minimum of 1,038,846 gallons during each twelve (12) month period during the one (1) year that this Exhibit A is in effect, which one (1) year period will commence on  February 3, 2021 , and will end on  February 3, 2022. If the Purchaser should fail to purchase from Seller at least 1,038,846 gallons of gasoline products any twelve (12) month period, Purchaser shall pay Seller a "shortfall" amount of two cents ($.02) for each gallon below the 1,153,846 gallon minimum during any twelve (12) month period. The shortfall amount is due upon receipt and an interest of 3 % will be applied for any late payments.

PMG 001038

**ANY BUSINESS OR PRICING INFORMATION FURNISHED BY EITHER PARTY TO THE OTHER PURSUANT TO THIS AGREEMENT SHALL BE CONSIDERED STRICTLY CONFIDENTIAL**

UNIVERSAL PROPERTY SERVICES, INC.                  PETROLEUM MARKETING GROUP, INC.

Purchaser:                                          Seller:

By: _____                       By:_____

Name:                                               Name:

Title:                                              Title:

Date:                                               Date:

PMG 001039